AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No. **23mj1605-BLM**
Apple iPhone 12 )
IMEI353253183336336 )
("Target Device 1") )

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-1, incorporated herein by reference.

located in the   Southern   District of   California  , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8, USC sec. 1324 | Alien Smuggling |

The application is based on these facts:
See Attached Affidavit of CBP Enforcement Officer Adriana Rosas-Carranza, U.S. Customs and Border Protection, incorporated herein by reference.

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Adriana Rosas-Carranza, CBP Enforcement Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___telephone___ *(specify reliable electronic means)*.

Date: **May 4, 2023**

*Judge's signature*

City and state: San Diego, California     Hon. BARBARA L. MAJOR, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-1

PROPERTY TO BE SEARCHED

The following property is to be searched:

>Apple iPhone 12
>IMEI353253183336336
>("**Target Device 1**")

**Target Device 1** is currently in the custody of the Department of Homeland Security, Customs and Border Protection, 720 E. San Ysidro Blvd., San Ysidro, CA.

# ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachments A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Devices** for evidence described below. The seizure and search of the **Target Devices** shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Devices** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **April 1, 2022 to and including August 12, 2022**:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324.

# AFFIDAVIT

I, Adriana Rosas-Carranza, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for warrants to search the following electronic devices:

> Apple iPhone 12
> IMEI353253183336336
> ("**Target Device 1**")
>
> Samsung Phone
> IMEI 353819350186447
> ("**Target Device 2**")
> (collectively, "**Target Devices**")

as further described in Attachment A-1 and A-2 and to seize evidence of crimes, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B. I request permission to manually and forensically search the **Target Devices** for data beginning on April 1, 2022, up to and including August 12, 2022. I signed and swore to before U.S. Magistrate Judge William V. Gallo a prior search warrant for the **Target Devices** on August 15, 2022, which was filed as Case No. 22-MJ-1395. As described below, this second search warrant is sought to obtain data for an additional three months prior to the charged offense and to obtain data believed to be missing from the original extractions and may only be available through a manual review of the **Target Devices**.

2. The requested warrants relate to the investigation and prosecution of Jennifer Soledad ALVARADO for bringing in illegal aliens to the United States for financial gain (22cr2200-GPC). The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, 720 E. San Ysidro Blvd., San Ysidro, CA.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

**TRAINING AND EXPERIENCE**

4. I have been employed by U.S. Customs and Border Protection since 2001 and am currently assigned to the San Ysidro Criminal Enforcement Unit. I graduated from the CBP Basic Academy at the Federal Law Enforcement Training Center in Glynco, Georgia. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for twenty years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5. My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6. During my tenure as a CBP Officer, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the

issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to

make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

    a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

    c.    tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

    d.    tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On August 12, 2022, at approximately 2:30 P.M. Jennifer Soledad ALVARADO (Defendant) a United States Citizen, made application for admission into the United States from Mexico via the vehicle primary lanes at the San Ysidro, California Port of Entry, driving a 2016 Honda Accord bearing California license plates. Upon inspection before a United States Customs and Border Protection (CBP) officer, Defendant presented her SENTRI (Secure Electronic Network Traveler Rapid Inspection) card and United States Passport as proof of identity. Defendant stated she was driving to Moreno Valley, California and that she had been in Tijuana, Mexico to attend cosmetology school. The CBP officer observed the lock on the trunk to be loose and elected to conduct a cursory inspection of the trunk where he discovered multiple individuals concealed within it. Defendant was handcuffed and escorted to the Security Office. Defendant's vehicle was referred to secondary for further inspection.

12. In the vehicle secondary lot, an assigned CBP Officer assisted two males and one female out of the trunk of the vehicle. All three individuals were found to be citizens of Mexico without any documents that would permit them to enter or remain in the United States. The two male individuals were identified as Blas MARTINEZ-Ramirez (MW2)

and Glen BELTRAN-Lepe (MW3) and the female was identified at Isabel MATIAS-Garcia (MW1).

13. During the inspection of Defendant's car, a small gold box with $6,000 was found. The money was in all $100 bills and wrapped with a rubber band. In addition, a GPS tracker was found plugged into Defendant's car and the wi-fi light turned on. A forensic evaluation of this GPS tracker was conducted pursuant to a search warrant and a phone number associated with the SIM card was identified. Further research into that specific GPS model revealed that the GPS tracker is monitored/managed with the use of a cell phone application.

14. At approximately 4:02 P.M., Defendant was advised of her Miranda Rights and elected to give a statement. Defendant denied knowledge of the individuals in her trunk. Defendant stated she went to Tijuana, Mexico for cosmetology classes. Defendant stated while at the school, she gave her car to an unknown male from an auto body shop to change the oil in her car. Defendant gave her car to this man around 10:00 am and a different unknown male returned her car around 10:30 am or 11:00. Defendant said she left for the United States in her car around 1:00 p.m. Defendant stated she was going home to Moreno Valley, California. Defendant was show the **Target Devices** and she claimed both as belonging to her.

15. During a videotaped interview, MW1 admitted to being a citizen of Mexico with no documents to lawfully enter or reside in the United States. MW1 stated her cousin made the arrangements. MW1 stated she was to pay $15,000.00 US dollars to the smugglers. MW1 stated she was traveling to Salinas, California to reunite with her husband and children.

16. During a videotaped interview, MW2 admitted to being a citizen of Mexico with no documents to lawfully enter or reside in the United States. MW2 stated his family made the arrangements. MW2 stated he was to pay $19,000.00 US dollars to the

smugglers. MW2 stated he was traveling to Salinas, California to live and seek unlawful employment.

17. During a videotaped interview, MW3 admitted to being a citizen of Mexico with no documents to lawfully enter or reside in the United States. MW3 stated he made the arrangements. MW3 stated he was to pay $12,000.00 US dollars to the smugglers. MW3 stated he was traveling to Los Angeles, California to live and seek unlawful employment.

18. During a court ordered deposition of Mr. Martinez-Ramirez on December 2, 2022, Mr. Martinez-Ramirez described how he got into Defendant's car. When Mr. Martinez-Ramirez was told to get into the trunk, he expressed concern that he would not fit in the trunk with the other two people already in the trunk. The male instructing Mr. Martinez-Ramirez to get into said to him, "Yes, you do. We've even fit six people there." Then the male said, "The trip is safe. The car has done twenty trips. You are the twenty-first. You all are the twenty-first trip of this car."

19. As part of the investigation, the TECS records were pulled for both Defendant and her 2016 Honda Accord. According to those TECS records, the 2016 Honda Accord went into Mexico from the United States on April 6, 2022. The following day, Defendant drove into the United States on April 7, 2022 at 12:46 p.m. in the 2016 Honda Accord. Defendant then returned to Mexico in the same vehicle and on the same day at 2:03 p.m., which is only one hour and seventeen minutes later. From April 7, 2022 to August 12, 2022, Defendant crossed into the United States and returned to Mexico in the 2016 Honda Accord twenty-times where she returned to Mexico less than two hours later. Moreno Valley, California is approximately 107 miles (approximately 1 hour and 53 minute drive) from the San Ysidro Port of Entry.

20. A search warrant was obtained for **Target Devices** on August 15, 2022. A voice message was obtained from Defendant to another individual at 12:03 p.m. on August 12, 2022. In this message Defendant says, "In Tijuana. I haven't gotten a call from work

yet, that it's not ready yet, that maybe later. And there's no assurance. So, if by two in the afternoon, they don't call me or anything, well, I'm taking off already. And well, it'll be another day[1]."

21. The CBP Officer that extracted data from Defendant's phone stated that a complete extraction from the **Target Devices** was not done due to the technical limitations with the extraction software. However, that software has since been updated and it is likely a subsequent forensic extraction will successfully download more data now. In addition, a manual review of the **Target Devices** will reveal if Defendant's cellphone had an application installed to manage the GPS tracker found in her car.

22. Based upon my experience and training, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that Defendant was using the **Target Devices** to communicate with others to further the smuggling of multiple illegal aliens into the United States in the months prior to the date of her arrest. Accordingly, I request permission to search the **Target Devices** for data beginning on April 1, 2022, up to and including August 12, 2022.

## METHODOLOGY

23. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the devices. Cellular devices today can be simple cellular telephones, tablets, and text message devices, can include cameras, can

---

[1] Voice message is in Spanish, but have been translated to English. This is a portion of the voice message. The remainder of the message discusses what appears to be a different subject.

serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

20.   Following the issuance of this warrant, a case agent familiar with the investigation will collect the **Target Devices** and subject them to analysis both a manual analysis and a forensic analysis. The manual analysis of the data contained within the **Target Devices** will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

21.   Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the

identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

22. An extraction was obtained for the **Target Devices** pursuant to a search warrant issued on August 15, 2022. However, upon further review of the data extracted from the **Target Devices**, it appears the data extraction may be incomplete. Due to the upgrades to the extraction software, it is likely a subsequent extraction would reveal additional data. A manual review of **Target Devices** has not been performed yet.

## CONCLUSION

23. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of alien smuggling violation of Title 8, United States Code, Sections 1324. Accordingly, I request that the Court issue warrants authorizing law enforcement to search the item described in Attachment A-1 and A-2 and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Adriana Carranza, CBP Enforcement Officer

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 4th day of May, 2023.

_____
HON. BARBARA L. MAJOR
United States Magistrate Judge